UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES CUNNINGHAM,

   Petitioner,

            CASE NO. 5:08-CV-14283
  v.          JUDGE JOHN CORBETT O'MEARA
            MAGISTRATE JUDGE PAUL J. KOMIVES

MARY BERGHUIS,

   Respondent.

_____/

## REPORT AND RECOMMENDATION

*Table of Contents*

I.  RECOMMENDATION ............................................................................ 2
II.  REPORT ............................................................................................. 2
  A.  *Procedural History* ............................................................... 2
  B.  *Factual Background Underlying Petitioner's Conviction* .............. 4
  C.  *Standard of Review* ............................................................... 12
  D.  *Instructional Error (Claim 1)* ................................................. 14
    1.  *Clearly Established Law* ............................................. 14
    2.  *Analysis* ................................................................... 15
  C.  *Insufficient Evidence (Claim 2)* ............................................. 16
    1.  *Clearly Established Law* ............................................. 16
    2.  *Analysis* ................................................................... 18
  C.  *Prosecutorial Misconduct (Claim 3)* ....................................... 22
    1.  *Clearly Established Law* ............................................. 22
    2.  *Analysis* ................................................................... 22
  C.  *Ineffective Assistance of Counsel (Claim 4)* ............................. 24
    1.  *Clearly Established Law* ............................................. 24
    2.  *Analysis* ................................................................... 25
  C.  *Recommendation Regarding Certificate of Appealability* ............. 25
    1.  *Legal Standard* ........................................................ 25
    2.  *Analysis* ................................................................... 27
  C.  *Conclusion* .......................................................................... 27
III.  NOTICE TO PARTIES REGARDING OBJECTIONS ............................. 28

*****

I.  __RECOMMENDATION__: The Court should deny petitioner's application for the writ of

habeas corpus. The Court should also deny petitioner a certificate of appealability.

II.     REPORT:

A.      *Procedural History*

        1.      Petitioner James Cunningham is a state prisoner, currently confined at the Earnest C. Brooks Correctional Facility in Muskegon Heights, Michigan.

        2.      In April 2006, petitioner was convicted of felony murder, MICH. COMP. LAWS § 750.316(1)(b), kidnapping, MICH. COMP. LAWS § 750.349, and conspiracy to commit kidnapping, MICH. COMP. LAWS § 750.157(a), following a jury trial in the St. Clair County Circuit Court.  On May 22, 2006, petitioner was sentenced as a fourth habitual offender to concurrent terms of life imprisonment without the possibility of parole on the felony-murder conviction and 30-to-50 years' imprisonment on the kidnapping and conspiracy-to-commit-kidnapping convictions.

        3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following  claims:

        I.      Defendant was convicted based on insufficient evidence in violation of his due process rights where evidence demonstrated that he did not have the intent for felony murder and voluntarily abandoned the criminal enterprise, relieving him of criminal responsibility.

        II.     The trial court erred in failing to instruct on the defense of abandonment depriving Defendant of his rights to a properly instructed jury and to present a defense, or whether Defendant was denied his constitutional right to the effective assistance of an attorney if his trial counsel failed to request the instruction.

        III.    Defendant's due process rights were violated by prosecutorial misconduct in appealing to the sympathy of the jurors and in denigrating defense counsel.

        IV.     Defendant was denied his constitutional right to effective assistance of an attorney where his trial counsel failed to object to the prosecutorial misconduct.

2

V.     Defendant's double jeopardy rights were violated by his conviction for felony murder and the underlying predicate offense of kidnapping.

The court of appeals vacated petitioner's conviction and sentence for kidnapping on double jeopardy grounds, and affirmed petitioner's remaining convictions and sentences. *See People v. Cunningham*, No. 270990, 2007 WL 3408098 (Mich. Ct. App. Nov. 15, 2007) (per curiam).

4.     Petitioner, proceeding *pro se*, sought leave to appeal these five issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Cunningham*, 480 Mich. 1137, 746 N.W.2d 75 (2008).

5.     Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on October 8, 2008. As grounds for the writ of habeas corpus, he raises the following four claims:

I.     The trial court erred in failing to instruct on the defense of abandonment depriving Petitioner of the right to a properly instructed jury and to present a defense.

II.     Petitioner was convicted based on insufficient evidence in violation of his due process rights.

III.     Petitioner's due process rights were violated by prosecutorial misconduct in appealing to sympathy of jurors and in denigrating defense counsel.

IV.     Petitioner was denied his right to effective assistance of counsel due to counsel failing to object to prosecutorial misconduct.

1.     Respondent filed her answer on April 28, 2009. She contends that petitioner's claims are without merit.

2.     Petitioner filed a reply to respondent's answer on May, 27, 2009.

B.     *Factual Background Underlying Petitioner's Conviction*

The evidence adduced at trial was accurately summarized in petitioner's brief on appeal:

The charges in this case arose against Defendant and his co-defendants based on the killing of decedent, Ryan Rich. Mr. Cunningham's co-defendants beat Mr. Rich to death and later burned his body. Mr. Cunningham was not involved in the beating of Mr. Rich. Rather, the prosecution's theory of criminal liability was that Mr. Cunningham pushed Mr. Rich to the ground with knowledge that his co-defendants were going to beat him, whereupon Mr. Cunningham left the scene. Under this theory, Mr. Cunningham allegedly participated in a kidnapping of Mr. Rich, which served as the predicate felony for the felony murder after his co-defendants actually inflicted the injuries to Mr. Rich. However, as will be discussed below, Mr. Cunningham had no intent that Mr. Rich be seriously injured, and when he determined that serious injury was the intent of his co-defendants he abandoned the criminal enterprise.

There was extensive testimony, primarily in the first half of the trial, that is not highly relevant to the appeal. There was testimony from police officers, fire investigators, and crime scene investigators regarding the investigation and the crime scene. Because there was no dispute on the trial about how, when, or where Mr. Rich died, Appellant will not summarize that detailed testimony. In short, Mr. Rich's body was found burned in the trunk of a car. The cause of death, however, was blunt force trauma to the head. Relatives and friends of Mr. Cunningham's co-defendants testified that they saw the co-defendants and Mr. Rich in the garage of a house on Robbins Court the night that Mr. Rich was killed. Again, the details of this testimony are not of much importance to this appeal, because there was no dispute about who was present where, and little dispute about the details of the night. The testimony with more relevance was that of the investigators regarding Mr. Cunningham's statements to them and the testimony of Mr. Cunningham's co-defendants.

On direct examination, Doctor Kanu Virani testified that he was a Deputy Chief Medical Examiner by Oakland County. (T II 348-349). In June of 2005, he provided contract services to St. Clair County as a medical examiner. (T II 349). The body was identified as Ryan Rich. The body was tied with probably some copper wire. (T II 353). In the back of the head there was a depressed skull fracture. (T II 354). He had displaced fracture of the left side of the jaw. (T II 354-355). In his internal examination, he found fracture of the skull, fracture of the mandible and bleeding on the surface of the brain. (T II 355). Ryan was not alive at the time the fire was set. (T II 356). Based on his entire examination, Doctor Virani determined that Ryan died of blunt force head trauma. (T II 358.)

On direct examination, Detective Sandra Jacobson testified that she was present when there was first contact by the Sheriff's Department with Defendant following the discovery of Ryan Rich's body. (T III 508-509). It happened at Defendant's home at 911 Pine Street. She was with Detective Baker. Defendant acknowledged being at the Robbins Court address that Sunday night. Defendant

4

acknowledged seeing a vehicle that belonged to Ryan Rich but said that he had not seen Ryan Rich. (T III 509). Defendant said that he had known Stewart Ginnetti for seven or eight years. Defendant indicated that they were involved in some narcotics dealings together in the past, but not anymore.  (T III 510).

On direct examination, Lieutenant Michael Bloomfield testified that he was the officer on charge. (T III 596). He talked to defendant on multiple occasions in June and July of 2005. (T III 601). Defendant stated that he had never seen Ryan Rich at Robbins Court the night he was murdered. (T III 602). On October 28th, he asked defendant to come to the Sheriff's Department for an interview. The conversation was recorded as well. (T III 603). The prosecutor introduced a disk of an excerpt of a phone conversation that took place on November 29th in jail. (T III 609).  Lieutenant Bloomfield said that defendant was talking to his girlfriend Machell Wehrwein. (T III 609). The October 28th excerpt was played for the jury:

Defendant stated that earlier in the night Stewart Ginnetti called him and told him that somebody had gone and talked to his parole officer and told him he was selling drugs. Later on in the night Ginnetti called him up and said that he needed him to come up to Robbins Court.  He came up there and he was standing out in the driveway with Ginnetti. Ginnetti said they were going to kick the motherfucker's ass. He said that he did not want to get involved with something like that. Ginnetti said that he would deal with it himself. They went in there and Ginnetti told him to grab Ryan, take him to the ground, and beat the shit out of him. He hesitated but Ginnetti insisted. He grabbed onto Ryan and brought him down to the ground. Ginnetti tied Ryan up with an extension cord and then taped him. He told Ginnetti that he did not want to be part of that. Ginnetti told him to get out of there. The next day he learned that Ryan was dead. (T III 612-615). Defendant denied that he went back later and was part of the convoy that took Ryan out to the Sturdevant Road. (T III 615). Defendant said that as he was leaving Michael Bowman was coming down the driveway. Bowman asked him if Ryan was tied up. He said yes and said he was getting out of there. Ginnetti called him a few times and told him that everything was going to be all right and not to worry about it. (T III 616). Defendant said that he was scared. (T III 618).  He was sitting up all night scared to death. (T III 620).

The tape of the jail conversation was played as follows:
…[the] conspiracy was that Stewart Ginnetti was going to beat Ryan Rich up. That was the only conspiracy that was made and you said yourself. Right. So how they going to call that malicious assault when it was one person going to beat up one person. The only person that I talked about assaulting anybody was Stewey and there're trying to say that I knew everybody was going to jump this guy and beat the shit out of him. How would I know that? The only person I talked to him about beating him up was Stewey. (T III 654).

On cross examination, Lieutenant Bloomfield said that he was responsible for the overall investigation. (T III 656). He said that Michael Bowman and Stewart Ginnetti were the top of a pyramid in a local drug ring. Ryan Rich was introduced to those two men and started hanging out with them, which eventually led to his use of narcotics and his assistance in the sale of narcotics. (T III 657). Robert and Michael Hills were individuals that Ginnetti and Bowman used to further the drug sales. (T III 658). He never uncovered any evidence that Defendant was involved in the narcotics. (T III 658-659). Defendant was not involved in the drug transactions between Ginnetti, Ryan Rich, and Bowman. (T IV 668). Defendant denied a number of times in the interview that he had any prior knowledge of what was going to happen before he got to Robbins Court. (T IV 682-683).

The Prosecutor introduced a videotape recording from the Speedy Q gas station at Lapeer. (T IV 786-787). The tape was played with the prosecutor's explanation. (T IV 788). At the top left portion of the screen, there was Ryan Rich's vehicle pulled into a bay at the Speedy Q gas station. (T IV 788). Ginnetti was seen at the counter at the Speedy Q. Dobson was seen at the gas pump next to Ryan Rich's vehicle. (T IV 789). Ginnetti and Robert Hills were seen at the counter. Ginnetti re-entered the store with Hills. Ryan Rich's vehicle pulled out and left. (T IV 790). Dobson was seen bending over filling a container with Gasoline. Ginnetti returned to the store and approached the counter. (T IV 791).

On direct examination, co-defendant Robert Hills said that in June of 2005 he knew Stewart Ginnetti through Nicholas Dobson. (T IV 793). He did not know Michael Bowman. He knew Defendant. (T IV 793). Defendant had been at his home for parties once or twice. (T IV 793-794).  He was charged in relationship to the accident. Pursuant to a plea agreement he was permitted to plead to second degree murder, kidnapping, and conspiracy to commit kidnapping. (T IV 794). On June 26th of 2005, he lived at 2520 Robbins Court. His mother was home at that time. (T IV 795). Ginnetti came over that evening with Nick Dobson. Ginnetti asked his mother to go get beer. (T IV 796). He, his mother, and Bianca DiNoto went to get the beer. (T Iv 796-797). At that time, Ryan Rich was not there. He was gone for about ten minutes to get the beer. (T IV 797). He went in the house and then came back outside. He talked to Bianca in her car and she left. Rich got there after she left. He did not see Defendant arrive. He went into the garage, grabbed some more beer, came back out and he saw Defendant and Ginnetti talking. (T IV 798). Ginnetti was telling Defendant that Ryan was a snitch and that he was getting an ass kicking. (T IV 799). Ginnetti was telling Defendant that they were going to scare Ryan, were going to rough him up a little bit, and were going to take him out to the country. Ginnetti told Defendant that they were going to tie Ryan up and put him into the trunk of the car. He knew that Bowman was coming over. (T IV 800). He told them he was going in the house and Ginnetti told him to keep everybody inside. (T IV 801). Robert Hills said that his job was to make sure that his mother and sisters stayed in the house. At that point, Nick Dobson, Mike Hills and Ryan Rich were in the Garage. (T IV 802). Ginnetti seemed like he was trying to work Defendant into it. He came in the house and told his sister Heather what

6

he had just heard. (T IV 803).  He told that they were waiting on Bowman. His brother Michael came in the house, grabbed a roll of tape and went right back outside. (T IV 804). A couple hours later, Michael came in, grabbed some bags and went back outside. Then, Ginnetti came in and asked him if he had a change of clothes. He gave him a change of clothes. (T IV 805). He followed Ginnetti outside. ( T IV 805-806). When he went back outside, Defendant was not there. Ginnetti was driving Ryan's car. He was told to drive Ginnetti's car and to follow him. They stopped at the gas station on Lapeer Road, Ginnetti bought some gas, and he grabbed a pop, and then left there to the Evans Mining Corporation on Sturdevant Road. The gas was not for the car. Nick Dobson pumped the gas in the gas can. (T IV 806). Ginnetti pulled the car off to the side and he turned the car around. Ginnetti came running over to the car. Dobson set the car on fire, then came running back and he left with them in the car. At that point, he knew Ryan was in the trunk of the car and that Ryan had been killed. They stopped off at the gas station and then back to his house. (T IV 807).  Later he went into the garage. It was late on Monday afternoon. (T IV 807-808).

On cross examination, Robert  Hills said that Ginnetti told Defendant that they out to tie the 'snitch rat' up and throw him in the car and that they ought to take him out in the country to scare him. He did not see Defendant going 'yeah.' He did not see the Defendant nod his head. The conversation between Ginnetti and Defendant was all one-sided, Ginnetti telling Defendant what he wanted and should do. (T IV 822). At no point did he hear Defendant say, 'You're right. We're going to kick his ass.' (T IV 822-823). He did not actually think that Ginnetti was honest and planning on doing it. Ginnetti had ran his mouth quite a few times, but nothing had ever happened. He did not take it that seriously other than an ass whipping. (T IV 823). He thought that somebody was going to get his ass kicked and going to get tied up but not killed. (T IV 826-827). When he came out of the house and Ginnetti told him to drive his car, he did not see Defendant around. Defendant had nothing to do with the convoy to Evans Mine. (T IV 831).

On redirect examination, Robert Hills said that what he heard Ginnetti talking to Defendant about was tying Ryan up and taking him someplace else. (T IV 833). He understood that Ryan was going to be beaten up. But he thought Ryan would be just smacked around, something he could go home with. (T IV 835). Robert Hills said that he thought that Ryan was going to get beaten up, maybe some broken bones, but nothing he would not heal from. (T IV 835-836).  When Ginnetti was telling Defendant those things, Defendant just sat there. Defendant did not say or do anything. (T IV 836). He assumed Defendant left because he did not look like he wanted to stay. (T IV 836-837).

On recross examination, Robert Hills said that when Ginnetti was telling Defendant about what he would like to do, Defendant was standing there not doing anything. (T IV 838). Defendant looked like he just wanted to leave. (T IV 839).

On direct examination, Nicholas Dobson testified that he used to live with Defendant. (T IV 845). When he was homeless, Defendant took him in. (T IV 845). Stewart Ginnetti was his friend. He and Ryan Rich grew up together. He knew Michael Bowman through Ginnetti. (T IV 846).  Ginnetti sold drugs for Bowman. He sold drugs for Ginnetti. Rich sold drugs for Ginnetti. Robert and Michael Hills were his friends. (T IV 847). He pled to second degree murder, kidnapping, and conspiracy to commit kidnapping. In exchange for his plea, he agreed to give testimony. (T IV 848). When they got to Robbins Court, they started partying. Hills' mother was asked to go to the store and buy a case of beer. (T IV 854). After Hills' mother returned, Rich came over. Rich came in the garage and grabbed a beer. Defendant came over to Robbins Court. (T IV 855). Defendant and Ginnetti talked by the pedestrian door to the garage. There were Michael Hills, Rich, Ginnetti, and Defendant in the garage. (T IV 856). He could not hear what they were talking about. Heather Hills brought out the radio and went back in the house. (T IV 857).  They (he, defendant. Ginnetti, Michael Hills and Rich) started drinking again. Ginnetti yelled, 'Tackle him.' Everybody tackled Rich. Defendant was the first person to tackle. Defendant, Ginnetti, Michael Hills, and he were involved in that tackle. Defendant, Ginnetti, Michael Hills, and he were involved in that tackle. Ginnetti grabbed where the Defendant was and Defendant stepped back. Then, Ginnetti started tying up Rich with electrical cord. (T IV 858).  He, Ginnetti and Michael Hills were holding holding down Rich. (T IV 859). Dobson said that Defendant held for a short period of time, not even a few minutes. After [he] was down on the ground, Ginnetti moved in and took defendant's spot. (T IV 859). Defendant held [Rich] by the shoulders and head area with his hands. Ginnetti tied [his] hands and wrapped the cord around the neck. (T IV 860). Michael Hills ran in the house and got the tape. Ginnetti and Michael Hills used the tape to go over Ryan's hands and feet. Defendant was standing in the back. Ginnetti told Rich that he was going to beat him up. (T IV 861). Ginnetti told Rich that he was going to beat him up for telling on him and telling his business to everybody. Rich was asking what was going on. Defendant was standing in the background. (T IV 862). Defendant and Ginnetti left the garage together. He propped Rich off the floor against the car and shared a cigarette with him. Michael Hills was in the garage. He came outside of the garage. Defendant and Bowman were talking. (T IV 863). He saw Defendant and Bowman come around the corner of the garage talking. (T IV 864). He could not hear what they were talking about. Defendant got in his car and left a minute or two later. Bowman and Ginnetti stood in the driveway talking. (T IV 865). They told him to go in the garage and get Michael out of the garage and shut the light off on the way out. Rich was still in the garage tied up. (T IV 866). After Michael Hills and he were outside the garage, it sounded like somebody was getting beat up. He heard Bowman and Ginnetti shouting. It went on for about an hour to an hour and a half. He was in the driveway towards the end out by the road. Michael Hills was still with him. (T IV 867). Ginnetti came out if the garage, then Bowman came out if the garage and told Ginnetti to clean it up. Bowman borrowed Ginnetti's phone and called for a ride. Bowman left after that point. He went back in the garage after Bowman told Ginnetti to clean it up. He saw lots of blood.  Blood was all over the floor. Rich appeared to be dead. (T IV 868). Rich was not moving or breathing. (T IV 868-869). When he

initially spoke with the investigators, he did not tell them about defendant being there when Rich was tackled, because he felt since Defendant was not involved in any of the murder he should not be involved in the case. He felt that because Defendant left prior [to] the murder, he should not be implicated. When he left the garage after Rich was tied up, Rich had not been beaten. When he went back in the garage, Rich appeared dead. (T IV 875).

On cross examination he testified that most of the time before Rich was tackled Ginnetti and Defendant were inside the garage over by the door. They were talking in a normal manner. Everybody was talking in a normal matter. They were not over there being secretive about talking. At some point Ginnetti yelled 'Tackle him.' Defendant grabbed Rich first, and he and Michael Hills also grabbed Rich (T V 901). Ginnetti grabbed the cord off the floor. Defendant stood up and walked backwards. Ginnetti took the spot where Defendant was. (T V 902). Defendant was about five feet away. Nobody yelled to Defendant to get out of the way. As soon as Ginnetti was standing there with the cord, Defendant stood up and walked back. They tied Rich up and Defendant was still standing back five feet. At that point Michael Hills ran and got tape and came back into the garage. Defendant was still standing there. (T V 903). Defendant did not say anything. Defendant was just watching. Rich was tied up with the cord and the tape. (T V 904). Rich was asking what was going on. Ginnetti said, 'You disrespect me, you need to get your ass kicked.' Ginnetti did not say, 'We're going to kill you.' Defendant left. (T V 905).

On redirect examination, Dobson said that after Rich was taken down, Defendant was holding the upper half of Rich's body. Defendant did not have to get out of the way so Ginnetti could get in and tie Rich up. The right side was still open. (T V 921-922). Defendant backed up five feet. Defendant did not walk out the door. Defendant did not say anything. (T V 922).

On direct examination, Marchell Wehrwein testified that she was Defendant's former girlfriend. (T V 927). They had lived together for about eight months. Her relationship with Defendant ended around February of 2006. She maintained the relationship with the Defendant after he was charged in the case. She continued to communicate with Defendant when he was at the jail. (T V 928). She asked Defendant to tell her what his involvement in the case was. He did that in a letter. She kept it to herself after that point. On Monday of the week of the trial, she contacted Lieutenant Bloomfield. (T V 929). She indicated to him that she had the information. She learned that night she might become a witness in the case and that was what prompted her to call Lieutenant Bloomfield. (T V 930). In the letter, Defendant told her that they got Rich in the garage, that Rich and Ginnetti were fighting, arguing over something, that Ginnetti said, 'Get him,' that he grabbed Rich and put him to the ground, held Rich while Ginnetti tied Rich up with an extension cord, that the cord did not hold so they tied Rich with tape. (T V 931). Defendant told her that he held Rich while Ginnetti tied Rich. Defendant told her that once they got Rich tied up, he was done and he left. (T V 932).

9

During closing argument, the prosecution made the following statements:

But once he told as much truth as he was going to tell, he told you enough that if that's all you believe, if all you believe happened here is what Jim Cunningham suggested in that interview, he is guilty of all three crimes he's charged with. Legally and morally he's responsible for those three crimes.
(T 979, line 14-20).

We talked about the point of no return, and for whatever reason, the Defendant left. Now he wants you to believe that because he decided that he didn't want any part of it.
(T 987, line 7-10).

Are you going to kill him? But aside from that he's not shocked and surprised and he knows this is going someplace he doesn't want to go, and that's what he said. That's what he said about why he left. He knew it was going some place that he didn't want to go.
(T 988, line 1-5).

He cannot walk away after what he put in motion and the Judge is going to tell you that. He walked away from the garage knowing what was going to happen to Rich. That's why he left. But you don't get to just change your mind any more than the get-away driver gets to drive away when his co-defendant comes out with a fistful of cash and blood on his hands.
(T 996, line 9-15).

This Defendant got to walk away from that garage and Rich didn't. I know that in those last moments Rich must have wanted that second chance. He must have wondered in that confusion what's going on, why are they doing this, what's going to happen to me. He must have wanted that second chance and he didn't get it.
(T 998, line 1-6).

Quite honestly, I think the thing that stuck me the most was Mr. Marshall's attack on Rich's parents. To sit here in this courtroom and to call them liars after what those people have been through is the most offensive thing I think you've heard in the course of this trial.

To get word that your 20-year-old son had been found burned beyond recognition in the trunk of his own car, tied up in the fashion that Rich was, and to whether or not they could recall every detail or testify about that here as they're struggling to maintain their

composure, isn't that just offensive and doesn't that tell you how distorted just about everything you just heard was?
(T 1024, line 12-24)

       Beyond a reasonable doubt is exactly that. It's something we talked about the first day. It is not what the Defense just suggested to you that it was. It's not whether or not you feel comfortable getting in a car and driving across country, it's not medical certainty and that's basically a beyond a --- you're talking about death as the alternative to the right choice if you misdose medication, and he wants you to believe so positive of your verdict to a medical certainty, and he used the word "precision."

       Of course that's what he wants, because that's unattainable in this setting. This is not science, this is a courtroom. And what we do work with in this setting is reason, the common sense and logic, and that's exactly what the judge told you the first day when you consider reasonable doubt, and that's exactly the standard that you should apply and I'm going to ask you to apply in considering this evidence. It's not proof beyond every doubt. It's not proof beyond every possible doubt. It's not proof beyond every possible doubt. It's proof beyond a reasonable doubt. And how on earth can there be a suggestion that there's a reasonable doubt in this case when the Defendant, and his own words, told you that he conspired with Stewart Ginnetti to take Rich down? Well, since you can't distort those facts, you saw it yourself, what so you have to do then? Distort the law.
(T 1026-27, line 11-11).

       Rich has no voice, and I'm going to ask you to be his. There's no compromise for him and I'm going to ask [you] to follow the law and to find the Defendant guilty and responsible for what he did, what he knew, and what he chose.
(T 1031, line 12-16).

Def.-Appellant's Br. On Appeal, in *People v. Cunningham,* No. 270990 (Mich. Ct. App.) at 4-17.

C.    *Standard of Review*

      Because petitioner's application was filed after April 24, 1996, his petition is governed by the

provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-

132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst

other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

12

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.    *Instructional Error*

Petitioner claims the trial court erred in failing to instruct on the defense of abandonment, depriving defendant of the right to a properly instructed jury and to present a defense. The court should conclude that petitioner is not entitled to habeas relief on this claim.

2.1    *Clearly Established Law*

In order for habeas corpus relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned; rather, taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair. *See Estelle v. McGuire,* 502 U.S. 62, 72 (1991); *Henderson v. Kibbe,* 431 U.S. 145, 154 (1977); *Wood v. Marshall,* 790 F.2d 548, 551-52 (6th Cir. 1986); *cf. United States v. Sheffey,* 57 F.3d 1419, 1429-30 (6th Cir. 1995) (standard of review for jury instructions challenged on direct criminal appeal). As the Supreme Court noted in *Estelle,* the Court should "also bear in mind [the Supreme Court's] previous admonition that we 'have defined the category of infractions that violate "fundamental fairness" very narrowly'". *Estelle,* 502 U.S. at 72-73 (quoting *Dowling v. United States,* 493 U.S. 342, 352 (1990)). If an instruction is ambiguous and not necessarily erroneous, it can run afoul of the Constitution only if there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. *See Estelle,* 502 U.S. at 72 & 73 n.4; *Boyde v. California,* 494 U.S. 370, 380 (1990). Nonetheless, instructional errors of state law will rarely form the basis for federal habeas corpus relief. *See Estelle,* 502 U.S. at 71-72.

2.     *Analysis*

Petitioner contends that he was entitled to a specific instruction on the defense of abandonment pursuant to *Hill v. Hofbauer,* 337 F.3d 706 (6th Cir. 2003). As the Michigan Court of Appeals stated, "'[a]bandonment is an affirmative defense, and the burden is on the defendant to establish by a preponderance of the evidence voluntary and complete abandonment of a criminal purpose.'" *Cunningham,* 2007 WL 3408098, at *2, slip op. at 2. (quoting *People v. Akins,* 259 Mich. App. 545, 555, 675 N.W. 2d 863, 873 (2003)). The court further pointed out that "[a]bandonment by the defendant is 'voluntary when it is the result of repentance or a genuine change of heart" and therefore "[t]he abandonment defense is not available where 'the defendant fails to complete the

14

attempted crime because of unanticipated difficulties, unexpected resistance, or circumstances which increase the probability of detection or apprehension." *Id.*  Therefore, even if petitioner had a change of heart after he assisted in apprehending the victim, the kidnapping (the predicate felony for the felony-murder conviction) had been completed before the defendant abandoned the crime. Petitioner helped apprehend the victim before he was eventually murdered. Even if petitioner left the scene before the victim was actually murdered, petitioner knew that harm was going to be done to the victim. Petitioner also did nothing to get the victim out of the dangerous situation in which he had put the victim.  As the court of appeals stated, "[i]f a defendant has taken the *last proximate step* toward the completion of the offense and is powerless to prevent its consummation, yet fails to commit the ultimate offense for other reasons, it may be too late to abandon the criminal purpose and avoid liability for the attempt." *Id.* at *3 slip op. at 3. (quoting *People v. Kimball,* 109 Mich. App 273, 286, 311 N.W. 2d 343, 349 (1981))(emphasis in original). In this case petitioner completed the kidnapping before he left the scene.   Therefore, the court of appeals correctly found that abandonment was not available as a defense to petitioner, and thus he was not entitled to an abandonment instruction.

The trial court did not deprive petitioner of his constitutional right to present a defense. The trial court did not prevent petitioner from calling witnesses in support of his abandonment theory. Rather, "abandonment was not available as a defense because the kidnapping (the predicate felony for the felony-murder conviction) had been completed before [petitioner] desisted." *Cunningham*, 2007 WL 3408098 *3, slip op. at 3. Petitioner has cited to nothing in the record that would support a conclusion that the evidence at trial supported an abandonment instruction to be given to the jury. Therefore, because the instructions given to the jury were not erroneous petitioner's argument is without merit.

E.    *Insufficient Evidence*

15

Petitioner next claims he was convicted based on insufficient evidence; that there was evidence that supported his claim that he did not have the necessary intent for felony murder and that he voluntarily abandoned the criminal enterprise. The Court should find that these claims are without merit.

   1.1    *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship,* 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)(emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris,* 972 F.2d 675,678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley,* 2 F.3d 645,650 (6th Cir. 1993).

However, under the amended version of § 2254(d)(1) a federal habeas court must apply a more deferential standard of review to the state court decision. Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable.  *See Gomez v. Acevedo,* 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella,* 522 U.S. 801 (1998); *Restrepo v. DiPalolo,* 1 F. Supp. 2d 103, 106 (D. Mass. 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson,* 443 U.S.

at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York,* 432 U.S. 197, 211 n.12 (1977); *see also, Jackson,* 443 U.S. at 324 n. 16; *Mullaney v. Wilbur,* 421 U.S. 684,691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier,* 186 F. 3d 91, 97 (2d Cir. 1999).

Under Michigan law:

"to support a finding that a defendant aided and abetted a crime, the prosecutor must show that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended the commission of the crime or had knowledge that the principle intended its commission at the time he gave aid and encouragement."

*People c. Carines,* 460 Mich. 750, 757-58, 597 N.W. 2d 130, 135 (1999) (internal quotation omitted).

The elements of first degree felony murder are: "(1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that the death or great bodily harm was the probable result; (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in the M.C.L. § 750.316." *People v. Turner,* 213 Mich. App. 558, 566, 540 N.W.2d 728,732, (1995). Kidnapping is an enumerated felony. *See* MCL 750.316(1)(b).

*2.2    Analysis*

In his habeas petition and reply brief, petitioner argues that he was convicted of aiding and abetting kidnapping as well as felony-murder without proving each element of those two criminal offenses; specifically without proving 'specific intent.' First, petitioner argues that there was insufficient evidence of malice to support his felony-murder conviction. It is the job of the jury, not

this Court sitting on habeas review, to resolve conflicts in the evidence, and this court must presume that the jury resolved those conflicts in favor of the prosecution. *See Jackson,* 443 U.S. at 326; *United States v. Sherwood,* 98 F.3d 402, 408 (9th Cir. 1996). A reviewing court, whether on direct appeal or habeas review, "do[es] not make credibility determinations in evaluating the sufficiency of the evidence." *United States v. Owusu, 199* F.3d 329, 344 (6th Cir. 2000); *Walker v. Russell,* 57 f.2d 472, 475-76 (6th Cir. 1995). The Michigan Court of Appeals found that the evidence presented in this case shows that petitioner "knew in advance that [codefendant] Ginnetti was angry at the victim, and intended to tie him up and inflict a severe beating on him." *Cunningham,* 2007 WL 3408098, at *2, slip op. at 2. There was also evidence that Ginnetti told petitioner to hold the victim down while the codefendants "beat the f-king sh-t out of him." *Id.* After hearing Ginnetti's signal, petitioner was the first of the codefendants to tackle the victim and also hold the victim down while Ginnetti tied him up. *Id.* The Michigan Court of Appeals found that "in a light most favorable to the prosecution, the evidence was sufficient to enable the jury to find beyond a reasonable doubt that the defendant assisted in the crime, with knowledge that Ginnetti intended to inflict great bodily harm upon the victim, and therefore, acted with willful and wanton disregard of the natural and likely consequences of his actions, sufficient to support a finding of malice." *Id.* Therefore, sufficient evidence was provided to show that petitioner assisted in the commission of the crime, and had knowledge that the principal (Ginnetti) intended its commission at the time he gave aid by tackling the victim and holding him down while he was tied up.

Petitioner cites *United States. v. Brown,* a case in which the Sixth Circuit stated: "To be found guilty of the crime of aiding and abetting a criminal venture, a defendant must associate himself with the venture in a manner whereby he participates in it as something that he wishes to bring about and seeks by his acts to make succeed." 151 F3d 476, 486 (6th Cir. 1994). *Brown* is

18

inapplicable here, because it is a federal criminal case and does not address the elements of aiding and abetting under Michigan law. In any event, petitioner participated in the kidnapping of the victim and knew the victim was going to receive great bodily harm. Because petitioner had knowledge that the victim was going to be beaten, and his participation and acts led to the successful murder of the victim, petitioner was rightfully found guilty of aiding and abetting a criminal venture.

Petitioner also argues that "[k]nowledge that a crime is being committed, even when coupled with presence at the scene, is generally not enough to support a conviction of aiding and abetting." *United States v. Bryant,* 461 F2d 912, 920 (6th Cir. 1972). However, petitioner did not only have knowledge that a crime was being committed, but he participated in the success of that crime as well. It is well established that "[i]f the aider and abettor participates in a crime with knowledge of his principal's intent to kill or cause great bodily harm, he is acting with 'wanton and willful disregard' sufficient to support a finding of malice." *Cunningham,* 2007 WL 3408098 at *1, slip op. at 2, (quoting *People v. Kelly,* 423 Mich. 261, 278-79; 378 N.W.2d 365, 372 (1985); *see also People v. McKenzie,* 206 Mich. App. 425, 428-29, 522 N.W.2d 661, 663 (1994). Here, there was evidence that showed that petitioner knew the victim was going to be beaten and was the first person to tackle and hold the victim down while he was being tied up. From this evidence, a rational trier of fact could have concluded that petitioner "intentionally set in motion a force likely to cause death or great bodily harm." *People v. Aaron,* 409 Mich. at 729, 299 N.W.2d at 327. Thus, a reasonable trier of fact could have, and in fact did, find sufficient evidence of malice to support a felony-murder conviction. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his sufficiency of the evidence claim.

Petitioner next argues, with support from an affidavit from codefendant Ginnetti, that he abandoned the criminal enterprise and was not present during the assault or murder and had in fact

19

left the scene before any felonies were committed. This claim is also without merit. A writ of habeas corpus may be granted "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, the existence of new evidence, standing alone, is not a basis for granting the writ. As the Supreme Court has explained: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins,* 506 U.S. 390, 400 (1993); *see also, id.* at 404 (claim of actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise [procedurally] barred *constitutional* claim considered on the merits.") (emphasis added); *Schlup v. Delo,* 513 U.S. 298, 314-16 (distinguishing, in part, *Herrera* because in this case the petitioner "accompanie[d] his claim of innocence with an assertion of constitutional error at trial."); *Townsend v. Sain,* 372 U.S. 293, 317 (1963) ("Of course, such evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus."),overruled in part on other grounds, Keenvey v. Tamayo-Reyes, 504 U.S. 1 (1992). Thus petitioner's assertion of innocence, standing alone, provides no basis for habeas relief.

Codefendant Ginnetti, who wrote the affidavit, is serving a life sentence without possibility of parole. When a codefendant is serving such a sentence any affidavit is inherently suspect because the codefendant could have signed the affidavit in order to help  petitioner without endangering his own interests. *See Allen v. Yukins,* 366 F.3d 396, 406 (6th Cir. 2004).  The affidavit claims that petitioner had nothing to do with the kidnapping or murder of the victim. Ginnetti also states that petitioner was at one time present in the garage where the victim was killed, but left before anything ever happened to him. Ginnetti claims, "I was the only person that knew what was going to happen to Mr. Rich that

night and I was the only person that carried out the plans that led to Mr. Rich's untimely death." (Pet., Ex. 1, Aff. of Stewart Ginnetti). However, the affidavit is inconsistent with the evidence presented at trial in which the trier of fact found sufficient evidence that petitioner participated in the kidnapping of Mr. Rich which eventually led to Mr. Rich being beaten to death. Therefore, the Court should conclude that petitioner's new evidence claim does not provide a basis for habeas relief.

F.      *Prosecutorial Misconduct*

Petitioner next argues that his procedural due process and fair trial rights were violated because the prosecution appealed to the sympathy of the jurors and denigrated defense counsel in the jury's presence. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

2.1     *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986).  Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation omitted). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v, Phillips,* 455 U.S. 209, 219 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted).  In

21

sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (internal quotation omitted).

2.2     *Analysis*

Petitioner argues that the prosecution appealed to the sympathy of the jurors because the prosecution stated "the victim was probably confused, and wished that he had a second chance." *Cunningham,* 2007 WL 3408098, at *4, slip op. at 4 (2007). The prosecution also asked the jury "to be the victim's voice." *Id.*   The court of appeals stated "To the extent that any of the prosecutor's statements could be construed as an appeal for sympathy, the trial court's instruction that the attorneys' statements and arguments are not evidence, and that the jury may not allow sympathy to influence its decision, was sufficient to cure any potential prejudice." *Id.*   The Court of Appeals pointed out that "a prosecutor need not phrase her argument blandly after all, she is an advocate, and has not only the right, but the duty, to advocate her case vigorously." *Id.* (citing *People v. Cox,* 268 Mich.App 440, 451; 709 NW2d 152 (2005); *People v. Marji,* 180 Mich.App 525, 538; 447 NW2d 835 (1989)).   In this case the prosecutor's conduct did not deny petitioner's due process rights and did not mislead the jury to prejudice the petitioner.   "[T]he jury was instructed that the attorneys' statements and arguments are not evidence, and to not be swayed by sympathy or prejudice." *Id.* at *5.   Furthermore, the jury was instructed to apply the law as stated by the court, not the lawyers. *Id.* There was enough evidence before the trial court to establish that any potential prejudice was cured by the court's instructions. Even if improper, the prosecutor's references to the victim were much less prejudicial then other comments referring to victims which have been upheld on habeas review. *See,* e.g., *Brechen v. Reynolds,* 41 F.3d 1343, 1355-56 (10th Cir. 1994);  *United States ex. rel. Rockman v. DeRobertis,* 717 F. Supp. 553, 569-70 (N.D. Ill. 1989)(prosecutor's reference to victim "in his grave crying out for a guilty verdict" did not deprive petitioner of a fair trial); *Kordenbrock v. Scroggy,*680

22

F. Supp. 867, 896-96 (E.D. Ky. 1988)(petitioner was not denied a fair trial where, during the guilt-innocence phase of the trial, the prosecutor admonished the jury not to forget the victim because "he had a right to live."), *rev'd on other grounds,* 919 F.2d 1091 (6th Cir. 1999)(en banc). Therefore, the Court should deny habeas relief on this claim.

G.      *Ineffective Assistance of Counsel*

Petitioner also raises the claim that counsel was not acting as an attorney guaranteed under the Sixth Amendment and but for her error a reasonable probability exists of a different trial outcome. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

2.1      *Clearly Established Law*

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington,* 466 U.S. 688, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id.* at 687. These two components are mixed questions of law and fact. *See id.* at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffective claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the inquiry, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *O'Hara v. Wigginton,* 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"

23

*Strickland,* 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, 'whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

### 2.2 Analysis

Petitioner argues that counsel failed to object to prosecutorial misconduct. However, it has already been shown that any prosecutorial misconduct petitioner might have faced during trial, or any potential prejudice petitioner possibly could have encountered from such misconduct was cured by jury instructions from the court. *See supra,* part F. It has also been shown that even worse prejudicial comments by prosecutors have not warranted relief on habeas review. *Id.*   The conclusion that the comments did not deprive petitioner of a fair trial compels the conclusion that petitioner was not prejudiced by counsel's failure to object. *See White v. Withrow,* No. 00-CV-74231, 2001 WL 902624, at *12 (E.D. Mich. June 22, 2001) (Rosen, J.) (citing *United States v. Nwankwo,* 2 F. Supp. 2d 765, 770 (D. Md. 1988)) (no prejudice from counsel's failure to object to prosecutorial misconduct where prosecutor's comments did not deprive petitioner of a fair trial).   Thus, the Court should find petitioner's ineffective assistance of counsel claim meritless.

### H.    Recommendation Regarding Certificate of Appealability

#### 1.    Legal Standard

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability.   *See* 28 U.S.C. § 2253(c)(1).   The statute further provides that "[a]

certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).   As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000).   Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84.   Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable."   *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254.   The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of

Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue."  FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id*., advisory committee note, 2009 amendments.  In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

    2.    *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should conclude that petitioner is not entitled to a certificate of appealability.  It is not reasonably debatable that petitioner was not entitled to a jury instruction on abandonment because he had assisted in the kidnapping before he left the scene. It is also not reasonably debatable that there was sufficient evidence to convict petitioner, *see supra* part E, because the record shows that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Lastly, petitioner's claim of ineffective assistance of counsel in failing to object to prosecutorial misconduct is without merit because petitioner has failed to show that the conduct of the prosecutor prejudiced him, and thus the resolution of this claim is not reasonably debatable.  Accordingly, the Court should conclude that petitioner is not entitled to a certificate of appealability.

I.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.    <u>NOTICE TO PARTIES REGARDING OBJECTIONS:</u>

26

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                    s/Paul J. Komives_____
                                    PAUL J. KOMIVES
                                    UNITED STATES MAGISTRATE JUDGE
Dated: 7/19/10


> The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and  by electronic means or U.S. Mail on July 19, 2010.
>
>                         s/Eddrey Butts_____
>                         Case Manager

27